UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JIMMY ROGERS PIERRE, : | |
| : | Civil Action No.  09-6345 (JAP) |
| Petitioner, : | |
| : | **OPINION** |
| v. : | |
| : | |
| SCOTT WEBER, et al., : | |
| : | |
| Respondents. : | |

PISANO, District Judge.

    This matter comes before the Court raising the reoccurring issue in Section 2241 litigation of challenges to pre-removal order detention.  On December 8, 2009, Petitioner Jimmy Rogers Pierre ("Pierre") filed a petition seeking habeas relief for himself and a class of "similarly situated."  See Docket Entry No. 1, at 2.  On January 11, 2010, Pierre filed his amended petition ("Petition"), superseding the original filing.  This pleading was filed solely on Pierre's own behalf and asserted jurisdiction under 28 U.S.C. § 2243, that is, the disposition statute.   Pierre's reliance upon which suggests his intent to assert jurisdiction under the "habeas statute" Section 2241.  See Munaf v. Geren, 128 S. Ct. 2207, 2221 (2008) ("The habeas statute provides only that a writ of habeas corpus 'may be granted,' § 2241(a), and directs federal courts to 'dispose of [habeas petitions] as law and justice require,' § 2243.") (emphases removed, citation omitted).  Being a pre-removal-order detainee, Pierre challenges his current detention by the Department of Homeland Security ("DHS").[1]

---

[1] The Homeland Security Act of 2002, 6 U.S.C. §§ 101-557, P.L. 107-296, 116 Stat. 2135 (Nov. 25, 2002), created the Bureau of Citizenship and Immigration Services ("BCIS") within the Department of Homeland Security.  See 6 U.S.C. § 271(a).  The Act transferred the functions of the Commissioner of the Immigration and Naturalization

1

**I.      BACKGROUND**

While "[h]abeas corpus petitions must meet heightened pleading requirements," McFarland v. Scott, 512 U.S. 849, 856 (1994), a measure of tolerance is given to pro se litigants. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Att'y Gen., 878 F.2d 714, 721-22 (3d Cir. 1989). Although Pierre's Petition is not of exemplary clarity, the statements made therein, read jointly with the exhibits provided by him, allow the Court to piece together the facts underlying Pierre's challenges as well as the gist of his legal claims without requiring Pierre to re-amend his Petition.

The circumstances at hand do not appear complex. Being a Haiti native, Pierre entered the United States in 1990, at the age of fifteen, as a permanent legal resident ("PLR"), the status known in layperson terms as a "green card holder." See Docket Entry No. 3, at 5. Four years later in 1994, Pierre pled guilty to his first penal offense, menacing in the third degree. See id. at 6; Docket Entry No. 3-2, at 4. Four years passed by and in 1998, Pierre was convicted of his second penal offense, petit larceny. See Docket Entry No. 3-2, at 4, 12. Another five years passed and in 2003, Pierre pled guilty to his third penal offense, menacing in the second degree. See Docket Entry No. 3, at 6; Docket Entry No. 3-2, at 4. Four years later in early 2007, Pierre was convicted of his first felony that resulted in a prison term of two to six years. See Docket Entry No. 3, at 5; Docket Entry No. 3-2, at 8. On October 26, 2007, Pierre was released on parole supervision, see Docket Entry No. 3-2, at 19, but two months later on December 24, 2007, was arrested and kept in custody on charges of sexual assault. See Docket Entry No. 3, at 6. On November 10, 2008, the sexual assault charges were dismissed, but Pierre was not released. See Docket Entry No. 6, at 2. Pierre remained in custody because three months prior to

---

Service ("INS") to the Director of BCIS, see 6 U.S.C. § 271(b), and abolished the INS. See 6 U.S.C. § 291. Accordingly, DHS replaced INS on March 1, 2003.

dismissal of the sexual assault charges on August 14, 2008 the DHS served Pierre with notice informing him that removal proceedings were instituted against him on the grounds that Pierre, after entering the United States, was convicted of at least two crimes of moral turpitude that did not arise out of a single scheme of criminal misconduct, i.e., on the basis supplied by 8 U.S.C. § 1226(c).  See Docket Entry No. 3-2, at 2.

During his proceedings before the immigration judge ("IJ"), Pierre vigorously opposed his removal by making numerous applications.  Specifically, he "applied for [c]ancellation of removal . . . [and for a]sylum, [and also for deferral and w]ithholding of removal, [plus he sought a remedy] under [A]rticle 3 of [the] Convention against torture."[2]  See Docket Entry No. 3, at 6.  However, on October 5, 2009, the IJ entered an order denying Pierre asylum, withholding of removal, cancellation of removal, deferral of removal, CAT remedy, etc., and ordered Pierre removed back to Haiti.  See Docket Entry No. 3, at 6; Docket Entry No. 3-2, at 2.  Seven days later, on October 14, 2009, Pierre filed his appeal to the Board of Immigration Appeals ("BIA"),

---

[2] An alien fearing persecution, harm or torture in his native country can seek asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  Asylum is granted if the alien proves that he has a "well-founded" fear of harm if he is returned to the native country.  Such proof is typically established by showing either past harm or fear of future harm, plus evidence as to the motivation of the persecutor.  Moreover, in order to grant or deny asylum, the IJ must examine the alien's evidence allegedly verifying that the alien's fear of harm is based on one of five statutory grounds (which are race, religion, nationality, political opinion, or membership in a particular social group). See INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987).  In order to obtain the remedy known as "withholding of removal," an alien must prove that there is a threat to his life or freedom if he is returned to the native country and, in addition, must show that this threat is connected to one of the five above-listed statutory grounds.  The judicial review associated with withholding of removal is more complex, since this remedy imposes a higher burden of proof than asylum in the sense that the alien must show that it is "more likely than not" that his life or freedom would be threatened if he is returned to the native country.  See INS. v. Stevic, 467 U.S. 407 (1984).  Finally, "[a]n alien seeking CAT relief must demonstrate 'that it is more likely than not that he or she will be tortured [if he is returned to the native country]."  Pierre v. Att'y Gen., 528 F.3d 180, 186 (3d Cir. 2008) (en banc).  For an act to constitute torture, it must be specifically intended to inflict severe physical or mental pain or suffering.  Id.  The act must also be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  Id. at 189 (quoting 8 C.F.R. § 208.18(a)(1)).  "It is not enough for public officials to be 'willfully blind' to torturous acts; the officials must 'have the goal or purpose of inflicting severe pain or suffering.'"  Amirov v. AG, No. 09-3928,  2009 U.S. App. LEXIS 26886, at *4 (3d Cir. Dec. 10, 2009) (citing Pierre, 528 F.3d at 190).  As the aforesaid demonstrates, a determination as to the grant of asylum, or as to withholding of removal, or as to the CAT remedy is a complex legal process that requires a substantial time investment by the presiding IJ.  The same applies to the cancellation of removal proceedings.  See Bernabe- Reyes v. AG, No. 09-1117, 2010 U.S. App. LEXIS 1128, at *2-3 (3d Cir. Jan. 19, 2010) (explaining the intricacies of the applicable test).

which prevented the IJ's order from becoming final with the simple passage of time.  On December 8, 2009, less than two months after filing his BIA appeal, Pierre filed with this Court his original petition, which was superseded by the instant Petition one month later.  In his instant Petition, Pierre asserts that he "faces an indeterminate period of future detention," because "[i]t would take months if not years to wait for a decision from the BIA" and, seeking to avoid such "indefinite detention," Pierre requests "immediate release . . . or, in the alternative, a hearing . . . at which [the DHS would] bear[] the burden of establishing that [Pierre's] continued detention is justified."  Docket Entry No. 3, at 2, 5 & 6.

   Although Pierre's legal claims consume eleven of the eighteen pages of his Petition, these contentions could be summarized in just a few points.  First, Pierre contends that the holding of Demore v. Kim, 538 U.S. 510 (2003), must be read extra-narrowly as limited to the facts of Kim.  This means the holding would apply only if (i) the detention of the alien corresponds, in time-frame, to the average period of detention represented by the Kim respondents in 2003; *and* (ii) the alien, same as the Kim petitioner, does not challenge his/her removability.  Since Pierre believes that he has been detained "too long" and, in addition, because he is challenging his removability, he claims that the holding of Kim is inapplicable to him.  Second, since Pierre believes that the so-read Demore v. Kim is inapplicable to his circumstances, Pierre argues that the Court must import the presumptively reasonable period announced in Zadvydas v. Davis, 533 U.S. 678 (2001), into Pierre's circumstances and order Pierre's release and/or re-characterize Pierre as an alien held under § 1226(a) (rather than under § 1226 (c)) and, upon such re-characterization, require the DHS to provide Pierre with bond hearings that are built into the scheme of § 1226(a).  See generally id. at 7-17.

4

Asking this Court not to find § 1226(c) facially unconstitutional, Pierre invites the Court to employ the canon of constitutional avoidance by merely finding the DHS's application of § 1226(c) as to Pierre unconstitutional in light of the fact that Pierre has not been released and has not received a bond hearing while awaiting the outcome of his deportation battle.  See id. at 2, 11-12.  In support of his position, Pierre offers his reading of Demore and Zadvydas, and relies upon Casas-Castrillon v. Dep't of Homeland Security, 535 F.3d 942 (9th Cir. 2008), Tijani v. Willis, 430 F.3d 1241 (9th Cir. 2005), Gonzales v. O'Connell, 355 F.3d 1010 (7th Cir. 2004), Ly v. Hansen, 351 F.3d 263 (6th Cir. 2003), Alli v. Decker, 644 F. Supp. 2d 535 (M.D. Pa. 2009), D'Alessandro v. Mukasey, 628 F. Supp. 2d 368 (W.D.N.Y. 2009), Bourguignon v. Macdonald, No. 08-30068, 2009 U.S. Dist. LEXIS 102298 (D. Mass. Oct. 30, 2009), Occelin v. ICE, No. 09-164, 2009 U.S. Dist. LEXIS 51444 (M.D. Pa. June 17, 2009), Victor v. Mukasey, No. 08-1914, 2008 U.S. Dist. LEXIS 96187 (M.D. Pa. Nov. 25, 2008), Wilks v. DHS, No. 07-2171, 2008 U.S. Dist. LEXIS 88587 (M.D. Pa. Nov. 3, 2008), Nunez-Pimentel v. DHS, No. 07-1915, 2008 U.S. Dist. LEXIS 49926 (M.D. Pa. June 27, 2008), Madrane v. Hogan, 520 F. Supp. 2d 654 (M.D. Pa. 2007), Fuller v. Gonzales, No. 04-2039, 2005 U.S. Dist. LEXIS 5828 (D. Conn. Apr. 8, 2005), Parlak v. Baker, 374 F. Supp. 2d 551 (E.D. Mich. 2005), and Uritsky v. Ridge, 286 F. Supp. 2d 842 (E.D. Mich. 2003).

**II.     DISCUSSION**

    **A.     Relevant Provisions and the Rationale of *Zadvydas***

The relevant provisions of Title VIII state:

§ 1226.  Apprehension and detention of aliens

(a)    Arrest, detention, and release. On a warrant issued by the Attorney General, an alien *may be . . . detained* pending a decision on whether the alien is to be removed from the United States.  Except as provided in subsection (c) and pending such decision, the Attorney General--

>                (1)     may continue to detain the arrested alien; [or]
>                (2)     may release the alien on--
>                (A)     bond of at least $1,500 with security approved by, and containing
>                            conditions prescribed by, the Attorney General; or
>                (B)     conditional parole . . . .
>    . . .
>    (c)     Detention of criminal aliens.
>                (1)     Custody. The Attorney General *shall take into custody* any alien
>                            who . . .
>                (B)     is deportable by reason of having committed any offense covered
>                            in . . . 8 U.S.C. § 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or
>                            (D),
>                (C)     is deportable under . . . 8 U.S.C. § 1227(a)(2)(A)(i) on the basis of
>                            an offense for which the alien has been . . . sentenced to a
>                            term of imprisonment of at least 1 year . . .
>                (2)     Release. The Attorney General may release an alien described in
>                            paragraph (1) only if the Attorney General decides . . . that release
>                            of the alien from custody is necessary to provide protection to a
>                            witness [or akin,] and the alien satisfies the Attorney General that
>                            the alien will not pose a danger to the safety of other persons or of
>                            property and is likely to appear for any scheduled proceeding. . . .

8 U.S.C. § 1226 (emphasis supplied).

In other words, detention under § 1226(a) is discretionary and requires individualized bond hearings, while detention under § 1226(c) is mandatory and does not provide for any bond hearing. Both provisions apply to "pre-removal-order detainees," that is, to those aliens who are in the midst of their removal proceedings and thus whose removal orders have not become "final."

Once the removal order becomes "final," the alien's "removal period" begins to run. Specifically, the "removal period" starts on the latest of the following: (1) the date when the order of removal issued by an IJ becomes administratively final (that is, appeal to BIA was either taken and ruled upon in the sense that the appeal was denied, or the time to file such appeal simply expired); or (2) if the removal order is judicially reviewed and if a court orders a stay of the removal, the date of the court's final order, or (3) if the alien is detained or confined (except

under an immigration process), the date when the alien is released from confinement.  See 8 U.S.C. § 1231(a)(1)(B).

Under Section 1231(a)(1)(A), the government has a 90-day "removal period" to remove an alien.  Detention during this 90-day removal period is mandatory.  Section 1231(a)(1)(c), however, provides that this 90-day removal period may be extended, and the alien may remain in detention during such extended period, if the alien "acts to prevent the alien's removal subject to an order of removal."  8 U.S.C. § 1231(a)(1)(c).

Moreover, even after the 90-day "removal period," the government may further detain the alien under 8 U.S.C. § 1231(a)(6).  However, the Supreme Court held that aliens may be detained under § 1231(a)(6) only for "a period reasonably necessary to bring about that alien's removal from the United States."  Zadvydas, 533 U.S. at 689.  Recognizing that its holding would lead to difficult judgment calls in the courts, the Supreme Court "for the sake of uniform administration in the federal courts" recognized a six-month "presumptively reasonable period of detention."  Id. at 700-01.  However, after establishing this "presumptively reasonable period of detention," the Supreme Court stressed that

> [a]fter this 6-month period, o[nly if] the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.  *This 6-month presumption, of course, does not mean that every alien not removed must be released after six months.  To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future*.

Id. at 701 (emphasis supplied).

Moreover, no language in Zadvydas excluded or limited the operation of the tolling-like function enunciated in 8 U.S.C. § 1231(a)(1)(c).  Consequently, an alien who, during his

7

presumptive six-month <u>Zadvydas</u>-based period, takes actions delaying his removal, cannot demand his release upon expiration of these six months.  <u>See</u>, <u>e.g.</u>, <u>Wang v. Carbone</u>, No. 05-2386, 2005 U.S. Dist. LEXIS 24499 (D.N.J. Oct. 17, 2005) (calculating the presumptive period excluding the period of non-cooperation and relying on <u>Riley v. Greene</u>, 149 F. Supp. 2d 1256, 1262 (D. Colo. 2001) and <u>Sango-Dema v. District Director</u>, 122 F. Supp. 2d 213, 221 (D. Mass. 2000)).  Rather, the period affected by the alien's actions is excluded from the six-month presumptive period articulated in <u>Zadvydas</u>, causing a quasi-tolling.

The rationale of such quasi-tolling is that it would be anomalous to suggest that an alien's frustration of the government's efforts to remove him would reward the alien with release from custody if the alien is persistent enough to keep his thwarting activities for a period exceeding <u>Zadvydas'</u> six months.  "<u>Zadvydas</u> does not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock."  <u>Pelich v. INS</u>, 329 F.3d 1057, 1060 (9th Cir. 2003).

      **B.**    <u>**Third Circuit's Interpretation of Demore v. Kim**</u>

The legal points discussed in the prior section reflect the legislative and judiciary balance of two considerations: (1) the right of the government to detain the alien awaiting a reasonably foreseeable removal, and (2) the right of the alien not to be placed in detention that might translate into a de facto life sentence (where an alien is imprisoned for the rest of his life awaiting, in vain, what is a realistically unattainable removal, e.g., a removal to the country that has refused to accept its citizens in the past, is refusing to do it now and indicated its intent to continue such refusal in the future).

8

These considerations, by definition, are present only with regard to an alien who is under a final order of removal. In contrast, an alien who is awaiting the finalization of his order of removal cannot, by definition, be in danger of a de facto life sentence—so long as the United States judiciary remains operable, any order of removal would necessarily become final at a certain foreseeable point in time.

Addressing this very point, the Court of Appeals for the Third Circuit recognized in Contant v. Holder that Zadvydas specifically only "concerned the prolonged detention of aliens subject to a final order of removal. . . .[and that] the Supreme Court held that [the post-removal-order] statute, when 'read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States,' and thus does not permit indefinite detention." Contant v. Holder, No. 09-1659, 2009 U.S. App. LEXIS 25506, at *4. However, unlike the petitioners in Zadvydas, where a pre-removal-order petitioner is being detained pending a decision on whether he is to be removed from the United States, there is no indication that this petitioner cannot be deported to his country of origin following an unfavorable removability decision. Id. at *5. The Third Circuit recognized that such pre-removal-order petitioner's removal proceedings were continued at the prisoner's own request and while exact dates cannot be determined when the proceedings will be complete, the prisoner does not find himself in a "removable-but-unremovable limbo" similar to the petitioners in Zadvydas. Id. (citing Jama v. Immigration and Customs Enforcement, 543 U.S. 335, 347 (2005)).

In evaluating pre-removal-order petitioner's detention, the Third Circuit likened the situation to that faced by the petitioner in Prieto-Romero v. Clark, 534 F.3d 1053 (9th Cir. 2008), who was detained for over three years while seeking administrative and judicial review of his

9

removal order.  Id.  In Prieto-Romero, the Ninth Circuit determined that the detention was authorized by § 1226(a), which was consistent with Zadvydas as limiting the Attorney General's detention authority to the period "reasonably necessary" to effectuate the alien's removal.  Prieto-Romero, 534 F.3d at 1063.  Although the court acknowledged there was some degree of uncertainty as to when the detention would conclude due to petitioner's pursuit of judicial review, the Ninth Circuit held that the detention was not indefinite because the petitioner "remain[ed] *capable* of being removed -- even if it ha[d] not yet finally been determined that he should be removed."  Id. at 1065 (emphasis in original).

Additionally, in analyzing pre-removal order petitioners in Contant, the Third Circuit evaluated the implications of Demore v. Kim which involved an alien detained during the pendency of removal proceedings pursuant to 8 U.S.C. § 1226(c).  528 U.S. 510 (2003).  The petitioner in Kim argued that § 1226(c) violated his due process rights because it did not require the [DHS] to determine that he posed either a danger to society or a flight risk.  Id. at 514.  The Supreme Court held that mandatory detention without an individualized determination was constitutionally permissible.  Id. at 531.  The Third Circuit noted that the Supreme Court in reaching that conclusion emphasized "the short period of time that most aliens are detained pursuant to § 1226(c), noting that in 85% of cases the alien's removal proceedings were completed in an average time of 47 days."  Contant, 2009 U.S. App. LEXIS 25506, at *7 (citing Kim, 538 U.S. at 529).  The Court in Contant found that like the petitioner in Kim a pre-removal-order petitioner's unusually lengthy period of detention pending a decision on his removability was attributable to his own request for a continuance.  Id.; see Kim, 538 U.S. at 530 (noting that petitioner's detention period of 6 months, which was longer than the average period of 47 days, was due to his own request for a continuance of his removal hearing).  Therefore, the Third

Circuit held that a pre-removal-order petitioner's detention is "not 'indefinite,' as there is no indication that he could not be removed to [his country of origin] if he is ordered removed, and the end of his detention is reasonably foreseeable; i.e., at the conclusion of his removal proceedings." Id. at *8.

### C.     Pierre's Position Is Without Merit

Here, Pierre invites this Court to convert Pierre's assertion that his detention was "too long" into a basis for his release or, at the very least, for importation of bond hearings (built into the scheme of § 1226(a) and inapplicable to Pierre on the grounds of his detention under § 1226(c)).  However, as the Court of Appeals explained in Constant, Pierre's position that he "faces an indeterminate period of future detention," Docket Entry No. 3, at 5, is facially without merit since a pre-removal-order petitioner's "detention is not 'indefinite,' as there is no indication that he could not be removed to [his country of origin] if he is ordered removed, and the end of his detention is reasonably foreseeable; i.e., at the conclusion of his removal proceedings." Contant, 2009 U.S. App. LEXIS 25506, at *8.  Therefore, a Zadvydas-like release from confinement is inapplicable to Pierre's circumstances.

That leaves only the issue of bond hearings, which are inapplicable to aliens like Pierre, detained under Section 1226(c) governed by Demore v. Kim.  Pierre seeks to distinguish Kim on the grounds that (a) in Kim, the government represented that average removal proceedings before an IJ lasted 47 days and proceedings that involved an appeal to the BIA consumed about five to six months; and (b) the petitioner in Kim did not seek to avoid his removal by claiming non-removability.

11

Pierre's position is without merit.  At no point did the Supreme Court in <u>Kim</u> condition its holding on the longevity of the average statistics existing in 2003.  Indeed, had the Supreme Court intended to note that <u>Kim</u> would remain good law if -- and only if -- such statistics persist or improve, it could have easily done so, but the language of <u>Kim</u> is silent to that effect.  <u>See</u> <u>Demore v. Kim</u>, 538 U.S. at 529-31 (discussing the statistical aspects).  Moreover, Pierre's discussion of average statistics ignores the fact that Pierre's removal proceedings were not all that "average."   To the contrary, such proceedings were laced with a panoply of challenges, each of which Pierre's IJ had to address by examining the evidence offered by Pierre and conducting distinct legal analyses.  Thus, any discussion of the average statistics noted in <u>Kim</u> would place the Court on the slippery slope of guessing whether or not Pierre's removal proceedings could have taken about a month and a half before the IJ and about five to six months with an appeal to the BIA included.  Without such foresight, this Court cannot intelligently find that the time frame would have been such.  However, it is reasonable to presume that Pierre's IJ would have issued the removal order sooner had the IJ not been required to address the multitude of Pierre's challenges.

Which, in turn, brings in Pierre's next point, i.e., that he must be rewarded by a bond hearing for contesting his removability.  An adoption of Pierre's position would clash with the Supreme Court's observation in <u>Kim</u> that the fact of the prolonged detention does not entitle an alien to individualized bond hearings if the alien "himself had requested a continuance of his removal hearing."  <u>Id.</u> at 530.  Moreover, Pierre's "reward-for-challenging-removability" position would fly in the face of the rationale of <u>Kim</u> clarified by the Supreme Court:

> Prior to the enactment of § 1226(c), when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation.  <u>See</u> S. Rep. 104-48, at 2 ("Delays can earn criminal aliens more than work permits and wages -- if they

12

> delay long enough they may even obtain U. S. citizenship"). Cf. Zadvydas, 533
> U.S. at 713 (Kennedy, J., dissenting) ("Court ordered release cannot help but
> encourage dilatory and obstructive tactics by aliens."). [The pre-removal-order
> alien here] contends that the length of detention required to appeal may deter
> aliens from exercising their right to do so. . . . As we have explained before,
> however, "the legal system . . . is replete with situations requiring the making of
> difficult judgments as to which course to follow," and, even in the criminal
> context, there is no constitutional prohibition against requiring parties to make
> such choices. McGautha v. California, 402 U.S. 183, 213 (1971) (internal
> quotation marks omitted); accord, Chaffin v. Stynchcombe, 412 U.S. 17, 30-31
> (1973).

Kim, 538 U.S. at 531, n.14. Consequently, Pierre's position as to the importation of §1226(a) bond hearings into his scenario is without merit and, same as his request for importation of Zadvydas presumptive period into his circumstances, is denied.

### D. Case Law Relied Upon by Pierre

The Court's discussion would be incomplete if the Court were not to mention the immigration cases invoked by Pierre, i.e. Casas-Castrillon, 535 F.3d 942; Tijani, 430 F.3d 1241; Ly, 351 F.3d 263; Gonzales, 355 F.3d 1010; Alli, 644 F. Supp. 2d 535; D'Alessandro, 628 F. Supp. 2d 368; Bourguignon, 2009 U.S. Dist. LEXIS 102298; Occelin, 2009 U.S. Dist. LEXIS 51444; Victor, 2008 U.S. Dist. LEXIS 96187; Wilks, 2008 U.S. Dist. LEXIS 88587; Nunez-Pimentel, 2008 U.S. Dist. LEXIS 49926; Madrane, 520 F. Supp. 2d 654; Fuller, 2005 U.S. Dist. LEXIS 5828; Parlak, 374 F. Supp. 2d 551; and Uritsky, 286 F. Supp. 2d 842.

Among these cases, those which outcomes were favorable to petitioners[3] could be roughly subdivided into three categories: (a) matters where alien-detainees raised various legal challenges and/or resorted to appeal(s) seeking to avoid removal, but the writs were granted simply on the grounds that the detention prolonged by the alien's legal actions was "too long"

---

[3] Some cases relied upon by Pierre followed the actual holding of Kim and reached the conclusion exactly opposite to that advocated by Pierre. For instance, Gonzales, 355 F.3d 1010, is one of such cases. There, the district court found that § 1226(c)'s mandatory detention requirement was unconstitutional as applied to the alien because the alien raised substantive legal question regarding his removability, but the Seventh Circuit reversed the district court's decision and withdrew the writ.

13

("No-Undue-Delay Cases"); (b) matters where the lengthy detention was a result not only of the alien's various legal challenges and/or appeals but also ensued from inefficient handling of the alien's applications by the judiciary ("Judicial-Delay Cases"); and (c) matters where the removal proceedings were prolonged as a result of undue dilatory tactics employed by the executive branch officials, i.e., the entities statutorily permitted to detain § 1226(c) aliens without bond hearings ("Executive-Delay Cases").

The holdings of the No-Undue-Delay Cases appear in direct conflict with the rationale of Kim, where the Supreme Court stressed that the alien's decision to select the route that might yield an eventual legal victory but, meanwhile, results in a prolonged detention, cannot serve as a basis for obtaining bond hearings.  See Kim, 538 U.S. at 531, n.14.  Consequently, this category of cases, while emotionally moving, appears legally unjustifiable, especially in light of all the tolling and quasi-tolling provisions of the immigration law that prevent an alien from convincingly arguing that the removal proceedings take "too long" while the alien self-servingly "controls the clock."  Pelich, 329 F.3d at 1060.

As it was noted by the Supreme Court, the practice of rewarding a proliferating detainee with bond hearings necessarily introduces the temptation to file meritless applications, see Kim, 538 U.S. at 531, n.14, which are destined to further clog the already heavily-docketed legal system.  Thus, this would increase the period needed for completion of an average removal proceeding and further fuel the argument that, in spite of being omitted from the scheme of § 1226(c), bond hearings could be needed to alleviate the increasing length of an average litigation.[4]

---

[4] Indeed, Section 1226(c), knowing no bond hearings, does not require the government to develop "more" reason (as time goes by) than the government has on day one.  Yet, the position of the No-Undue-Delay Cases (which, invariably, failed to offer any specific time frame or any other bright-line test) seems to suggest exactly that,

14

The rationale of the Judicial-Delay Cases appears equally unconvincing.  While, indeed, one cannot help to feel for an alien whose case is caught in the thickets of bureaucracy and long judicial dockets, or whose legal papers are carelessly lost by the courts, it would be anomalous to fault the executive branch for the shortcomings of the judiciary.  Finding otherwise would be equivalent to finding a parole commission in violation of the law on the grounds that the commission is not conducting parole hearings of a criminal detainee who is deprived of a speedy trial.  If a litigant is of the opinion that his legal proceedings are unduly delayed, his remedy is a writ of mandamus directing the lax judiciary to perform its proper duty, not a writ of habeas directing the jailor to stop performing the duty the jailor is properly performing under the statute.

That leaves the Executive-Delay Cases, the cases where the DHS officials engaged in dilatory tactics that effectively doomed the alien to a procedural limbo, making the alien incapable of being removed.  Compare Contant, 2009 U.S. App. LEXIS 25506.  In such situations, equitable considerations might warrant placing the burden of bond hearings on the DHS,[5] e.g., under the broad language of the All-Writs Act, 28 U.S.C. § 1651(a).  However, the Court need not reach this issue in dicta since Pierre's Petition does not make any allegations to that effect.  Consequently, the handful of cases that might be useful to Pierre as to their outcome are factually inapposite to the case at bar, while the remaining decisions relied upon by him are neither binding nor convincing.

---

conveniently leaving the government to wonder how much "more" reason it has to develop and at what rate in order to keep detaining the alien.

[5] One such matter was recently addressed in this District.  See Akinola v. Weber, 2010 U.S. Dist. LEXIS 5780 (D.N.J. Jan. 26, 2010).  In Akinola, multiple postponements of the alien's removal proceeding (some lasting up to three months) were consistently requested by the executive branch and then, upon the entry of the IJ order granting the alien deferral of removal, the executive branch placed the alien in a procedural limbo by appealing the IJ's decision to the BIA and continuing its postponement practice while keeping the alien in detention.  In light of these unique circumstances, the district court ordered a hearing to determine whether a bond hearing would be warranted.

In this District, the judges addressing the circumstances analogous to those of Pierre followed the holding of <u>Kim</u>.  For instance, in <u>Jean-Marie v. Bigott</u>, 2009 U.S. Dist. LEXIS 20280 (D.N.J. Mar. 13, 2009), the petitioner -- same as Pierre -- filed a habeas petition while awaiting his BIA appeal, asserting that his removal proceedings were taking "too long" after he raised asylum, withholding of removal, withholding of removal under the CAT, and a waiver of inadmissibility issues before his IJ.  Same as Pierre, the petitioner in <u>Jean-Marie</u> requested individualized bond hearings and/or immediate release.  However, relying on <u>Kim</u>, the court in <u>Jean-Marie</u> denied the petitioner's application.  <u>See</u> <u>id.</u> Finding the rationale of <u>Jean-Marie</u> sound, the Court here reaches the same conclusion.

## III.     CONCLUSION

For the foregoing reasons, Pierre's application is denied.  His motion to appoint counsel is dismissed as moot.

An appropriate Order accompanies this Opinion.

/s/ JOEL A. PISANO
United States District Judge

Date: March 31, 2010